*This opinion is subject to revision before final publication in the Pacific Reporter*

**2025 UT 15**

IN THE

# SUPREME COURT OF THE STATE OF UTAH

STATE OF UTAH,
*Appellee,*

*v.*

DUSTIN GILES ANDRUS,
*Appellant.*

No. 20220896
Heard September 6, 2024
Filed May 29, 2025

On Direct Appeal

Second District Court, Farmington
The Honorable David M. Connors
No. 211700097

Attorneys:

Derek E. Brown, Att'y Gen., Jonathan S. Bauer, Asst. Solic. Gen.,
Salt Lake City, for appellee

Emily Adams, Freyja Johnson, Hannah Leavitt-Howell,
Melissa Jo Townsend, Cherise M. Bacalski, Bountiful,
for appellant

CHIEF JUSTICE DURRANT authored the opinion of the Court, in
which ASSOCIATE CHIEF JUSTICE PEARCE, JUSTICE PETERSEN, and
JUSTICE HAGEN joined.

JUSTICE POHLMAN authored an opinion concurring in part and
dissenting in part.

CHIEF JUSTICE DURRANT, opinion of the Court:

## INTRODUCTION

¶1    A jury convicted Dustin Giles Andrus of several felonies after he, at age thirty-four, engaged in an extensive sexual relationship with a sixteen-year-old girl. On appeal, Andrus challenges his convictions on several grounds. First, he claims the state detectives who led the investigation in his case violated Utah's Electronic Information or Data Privacy Act (EIDPA)[1] when they asked federal officers to use federal administrative subpoenas to obtain electronic records linking him to the crime. And he argues that the trial court erred by denying his motion to suppress this illegally obtained evidence.

¶2    EIDPA provides a framework under which state law enforcement officers may obtain and use electronic records.[2] It also includes an exclusionary rule that bars Utah courts from admitting evidence obtained in violation of its provisions.[3] Based on the text and legislative history of the statute, we conclude that EIDPA's exclusionary rule does not require courts to suppress evidence that federal law enforcement officers lawfully obtained from third-party service providers and then gave to state officers. And Andrus has not persuaded us that the Utah Constitution requires courts to suppress evidence obtained via lawful federal subpoenas. The trial court therefore did not err in denying Andrus's motion to suppress.

¶3    Andrus also asserts that the State's evidence was insufficient to convict him on several counts. We vacate Andrus's

---

[1] UTAH CODE §§ 77-23c-101.2 to -105 (2019). EIDPA also contains references to Utah Code §§ 77-22-1 through -5 (the Subpoena Powers Statute). The legislature has amended both statutes since the events of this case occurred between 2019 and 2020. *See, e.g.,* Law Enforcement Investigation Amendments, H.B. 57, 2023 Leg., Gen. Sess. (Utah 2023); Sexual Exploitation Amendments, H.B. 167, 2022 Leg., Gen. Sess. (Utah 2022). We cite and apply the 2019 version of both laws throughout this opinion. *See State v. Clark*, 2011 UT 23, ¶ 13, 251 P.3d 829 ("[W]e apply the law as it exists at the time of the event regulated by the law in question.").

[2] *See* UTAH CODE §§ 77-23c-102 to -104 (2019).

[3] *Id.* § 77-23c-105 (2019).

conviction for human trafficking of a child, but we affirm his convictions for sexual exploitation of a minor and distribution of a controlled substance.

¶4 Finally, Andrus asserts that the court violated rule 404(b) of the Utah Rules of Evidence when it admitted at trial evidence related to Andrus's uncharged conduct in a different county. We conclude that some of the challenged evidence about his interactions with the same underage girl was admissible under rule 404(b). And we hold that admission of the remaining challenged evidence was harmless error.

¶5 In sum, we vacate Andrus's conviction for human trafficking of a child but affirm his other convictions.

## BACKGROUND[4]

¶6 In September 2020, a sixteen-year-old girl named Laura[5] reported to the Clearfield City Police Department that she had been in a sexual relationship with an older man. Laura told the officer who took her report that in September 2019 she met a man online whom she knew as "Timothy." Laura told Timothy that she was only sixteen years old.

¶7 Laura and Timothy's online conversations quickly turned sexual. They talked about meeting up in person to have sex. They first met in Timothy's car in a parking lot. At that meeting, after Timothy repeatedly asked her to, Laura touched Timothy's "groin." He then gave her marijuana, which she smoked.

¶8 Over the course of five months, Timothy and Laura met up several other times in a parking lot and engaged in penetrative and oral sex. On at least one other occasion, Timothy brought marijuana to their meeting, though Laura did not recall whether he messaged her ahead of time about his plan to bring it. During the course of the relationship, Timothy also offered to give Laura money, a car,

---

[4] Because Andrus challenges the sufficiency of the evidence supporting his convictions, "we review the record facts in a light most favorable to the jury's verdict and recite the facts accordingly." *State v. Stricklan*, 2020 UT 65, n.1, 477 P.3d 1251 (cleaned up). We also incorporate evidence adduced at the hearing on Andrus's motion to suppress, only as relevant to our review of the denial of that motion.

[5] A pseudonym.

more marijuana, and a place to live. At least once, when Laura expressed a lack of interest in sexual activity, he offered her "thousands of dollars for [her] to continu[e] doing acts with him."

¶9   During their relationship, Timothy messaged Laura through the phone applications Snapchat and TextNow. Timothy asked Laura to send him nude photos of herself, and she complied. Laura and Timothy also met frequently on video calls, during which Timothy asked Laura to undress and masturbate for him.

¶10  In February 2020, Timothy invited Laura to his house in Summit County, where they had sex, and he gave her alcohol and marijuana.[6] She unintentionally left her underwear at Timothy's house. After that encounter, she ended the relationship and tried to cut off contact with Timothy.

¶11  The police department assigned Laura's case to Detective Ginny Vance, who started trying to find Timothy. This was not easy, because Laura could not provide any information that clearly identified Timothy, such as his full name or address. Vance began trying to track Timothy down using the Snapchat and TextNow accounts he had used to contact Laura.

¶12 Though Laura had largely stopped responding to Timothy's messages by February 2020, he continued to send her messages during the investigation. In an interview with Laura, Vance took photographs of Snapchat messages Timothy had recently sent to Laura. In those messages, Timothy requested "sexy" photos of Laura for him to masturbate to, suggested repeatedly that they have sex, asked her if they could smoke together, questioned whether she still used "puff bars," and alluded to prior instances of sexual activity.

---

[6] After the prosecutor asked whether Timothy gave Laura alcohol and marijuana in Summit County, the prosecutor directed Laura to a picture of an electronic cigarette cartridge found in Andrus's home. When asked to define a "cart," Laura said, "It's a cartridge filled with THC." The prosecutor stated, "You said that Timothy had given you cartridges." He then asked, "Does that look similar to the carts that Timothy would give you?" Laura replied, "Yes." Laura did not discuss cartridges elsewhere in her trial testimony. THC, or tetrahydrocannabinol, is "the principal psychoactive constituent of marijuana." *State v. Price*, 2012 UT 7, ¶ 1, 270 P.3d 527.

¶13 Vance hoped Snapchat and TextNow could provide her with more identifying information. She worked with Detective Joshua Carlson, a state police officer who collaborated as often as daily with federal officers as a member of the FBI's Child Exploitation Task Force (CETF), which investigated crimes against children.[7] Requesting federal subpoenas to support an investigation was "pretty standard procedure" for state officers on the task force. The FBI administrative assistant supporting CETF received three or four requests for subpoenas every day from the twenty-five to thirty state officers on the task force.

¶14 Vance asked Carlson to seek administrative subpoenas to obtain records about Timothy from Snapchat and TextNow. The FBI issued the subpoenas, and soon Carlson obtained some of the internet protocol (IP) addresses that Timothy had used. Carlson later testified that he and Vance could have obtained the records through the Davis County Attorney's Office.[8] But Carlson believed that process would be "slow," and so he opted to obtain the records through the federal administrative subpoena process.

¶15 Building on the IP addresses he had obtained, Carlson requested that the FBI issue new administrative subpoenas to Verizon and Comcast. Those subpoenas revealed Timothy's phone number and the physical address attached to one of the IP addresses. The subscriber for the phone number was Dustin Giles Andrus—the appellant in this case—and the physical address was the Andrus Family Carwash where Andrus worked.

¶16 With that information in hand, Vance took a copy of Andrus's driver license photo, placed it in a lineup of photos of other individuals, and presented the lineup to Laura. Laura picked out two photos: one of Andrus and one of another man.

---

[7] The FBI has several state-federal task forces to collaborate in cases "where a crime may be a local, state, and federal violation all at the same time." *See Frequently Asked Questions: Do FBI agents work with state, local, or other law enforcement officers on "task forces"?*, FBI, https://www.fbi.gov/about/faqs/do-fbi-agents-work-with-state-local-or-other-law-enforcement-officers-on-task-forces (last visited May 19, 2025); *see also What We Investigate: Violent Crimes Against Children*, FBI, https://www.fbi.gov/investigate/violent-crime/vcac (last visited May 19, 2025).

[8] *See* UTAH CODE §§ 77-22-2.5(2) (2019); *id.* § 77-23c-104(2) (2019).

¶17 Police officers went to the car wash to interview Andrus. Andrus fled in his car before the officers could approach him. The officers then obtained a warrant for Andrus's arrest, and U.S. Marshals apprehended him a few days later.

¶18 Vance and Carlson also secured a search warrant for Andrus's house in Summit County. The search turned up a small bag, which a police officer testified contained marijuana, though officers never tested the substance forensically. The officers also found cartridges designed for electronic cigarettes, which could be used to inhale marijuana. Finally, among Andrus's possessions, the officers found the underwear that Laura had accidentally left at Andrus's home after their last sexual encounter, the only piece of physical evidence in the case that connected Andrus to his online identity as Timothy.

¶19 The State charged Andrus in Davis County with one count each of human trafficking of a child, sexual exploitation of a minor, and distribution of a controlled substance, four counts of unlawful sexual conduct with a sixteen- or seventeen-year-old child, and two counts of enticement of a minor. The State also filed charges in Davis County for three additional counts based on events occurring in Summit County but later asked the court to dismiss those charges to be refiled in Summit County.

¶20 Before trial began, Andrus moved to suppress the records the State had obtained through the federal administrative subpoenas, as well as any evidence the State obtained based on those records. Andrus argued that admitting this evidence would violate both EIDPA and article I, section 14 of the Utah Constitution. The State responded that EIDPA, a Utah law, did not prevent law enforcement officers from obtaining the records through valid federal subpoenas and that the federal subpoenas satisfied the requirements of the Utah Constitution. After an evidentiary hearing, the trial court denied Andrus's motion to suppress.

¶21 In another pretrial motion, the State moved to admit the evidence it had seized from Andrus's home in Summit County as narrative evidence to explain the crimes Andrus had committed in Davis County. Over Andrus's objection, the trial court ruled that the evidence was admissible in the Davis County trial.

¶22 The State called five witnesses at trial. First, Vance testified about her interactions with Laura, the course of her investigation, and the incriminating messages that Timothy sent Laura through

Snapchat. Next, Carlson testified about the process he used to obtain the federal administrative subpoenas and how the information obtained through those subpoenas linked Timothy to Andrus. Laura identified Andrus in court as the man she knew as Timothy and testified about the timeline and details of her involvement with him. Finally, another state officer testified about the search of Andrus's house, and a U.S. Marshal testified about Andrus's arrest. After the State rested, Andrus moved for a directed verdict on all counts, which the court denied.

¶23 The jury convicted Andrus on all of the Davis County counts. Andrus then moved the court to arrest judgment on several counts. The trial court granted the motion in part but denied it as to Andrus's human trafficking and sexual exploitation convictions. After sentencing, Andrus filed a timely appeal.

## ISSUES AND STANDARDS OF REVIEW

¶24 On appeal, Andrus challenges four rulings of the trial court. First, he argues that the court erred by denying his motion to suppress the fruits of the federal subpoenas. Second, he asserts that the trial court erred by denying his motion to arrest judgment on the human trafficking and sexual exploitation convictions. Third, he contends that the trial court erred by denying his motion for a directed verdict on the distribution of a controlled substance count. And fourth, he challenges the trial court's decision to admit evidence related to his conduct in Summit County.

¶25 We review a trial court's denial of a motion to suppress "for correctness, including its application of the law to the facts."[9]

¶26 "We review a [trial] court's grant or denial of a motion . . . to arrest judgment for correctness."[10] We reverse the trial court's denial of a motion to arrest judgment "only if the evidence, viewed in the light most favorable to the verdict, is so inconclusive or so inherently improbable as to an element of the crime that reasonable minds must have entertained a reasonable doubt as to that element."[11]

---

[9] *Brierley v. Layton City*, 2016 UT 46, ¶ 18, 390 P.3d 269 (cleaned up).

[10] *State v. Stricklan*, 2020 UT 65, ¶ 30, 477 P.3d 1251.

[11] *Id.* ¶ 31 (cleaned up).

¶27 We also review the denial of a motion for directed verdict for correctness.[12] We affirm that denial "if, when viewed in the light most favorable to the State, *some* evidence exists from which a reasonable jury could find that the elements of the crime had been proven beyond a reasonable doubt."[13] Stated differently, to prevail on a directed verdict, a defendant must show that "*no evidence existed* from which a reasonable jury could find" the defendant's guilt "beyond a reasonable doubt."[14]

¶28 "We afford [trial] courts a great deal of discretion in determining whether to admit or exclude evidence and will not overturn an evidentiary ruling absent an abuse of discretion."[15] But "we review for correctness" whether the trial court "applied the proper legal standard."[16]

## ANALYSIS

I. THE TRIAL COURT PROPERLY DENIED ANDRUS'S MOTION TO SUPPRESS

¶29 We first evaluate Andrus's claim that the trial court should have suppressed the fruits of the federal subpoenas. Andrus argues that this evidence should have been excluded under both EIDPA and article I, section 14 of the Utah Constitution. We conclude that EIDPA does not require state courts to exclude evidence obtained lawfully by federal officers under federal law and then shared with state officers. Here, Carlson—a state officer and member of a federal task force—asked federal officers to issue administrative subpoenas under federal law and then share the resulting records with state officers. So EIDPA did not require the trial court to exclude Andrus's subscriber records. And Andrus has not established that the trial court violated the Utah Constitution by admitting the fruits of a valid subpoena. The trial court thus properly denied Andrus's motion to suppress.

---

[12] *Id.* ¶ 30.

[13] *Id.* (cleaned up) (emphasis added).

[14] *Id.* (cleaned up).

[15] *State v. Cuttler*, 2015 UT 95, ¶ 12, 367 P.3d 981 (cleaned up).

[16] *Id.* (cleaned up).

*A. EIDPA's Exclusionary Rule Does Not Require a Court to Suppress Subscriber Records that Federal Officers Lawfully Obtained Under Federal Law and Then Gave to State Officers*

¶30   EIDPA, found in Utah Code title 77, chapter 23c, lays out a framework under which Utah law enforcement agencies may obtain electronic information. Under EIDPA, a "[l]aw enforcement agency" is "an entity of the state or a political subdivision of the state that exists to primarily prevent, detect, or prosecute crime and enforce criminal statutes or ordinances."[17] Under this definition, EIDPA regulates the conduct of Utah's police and other state law enforcement officers, but it does not reach the conduct of federal law enforcement officers or officers from other states.[18]

¶31 EIDPA protects several different categories of data, including subscriber records.[19] A "subscriber record" is "a record or information of a provider of an electronic communication service or remote computing service that reveals" enumerated information about the customer, including a customer's name, address, telephone number, and other customer identifiers, such as "a temporarily assigned network address."[20] In this case, both parties agree that the records Carlson accessed—IP addresses, subscriber names, phone numbers, and physical addresses—are subscriber records under EIDPA.[21]

¶32   Under EIDPA, "a law enforcement agency may not obtain, use, copy, or disclose a subscriber record" unless the agency follows the procedures laid out in Utah Code title 77, chapter 22 (Subpoena Powers Statute), or a statutory exception applies.[22] And

---

[17] UTAH CODE § 77-23c-101.2(4) (2019).

[18] *See id.*

[19] *See generally id.* §§ 77-23c-102, -104 (2019).

[20] *Id.* § 77-23c-104(1) (2019).

[21] Accordingly, we confine our analysis to subscriber records, and we do not consider whether EIDPA's exclusionary rule applies when non-state officers obtain other types of records outside of the EIDPA-endorsed process and hand them over to state officers.

[22] UTAH CODE § 77-23c-104(2) (2019); *see also id.* § 77-22-2.5(2) (2019) (describing requirements to obtain a court order for the

(continued . . .)

any electronic records "obtained in violation of the provisions of [EIDPA] shall be subject to the rules governing exclusion as if the records were obtained in violation of the Fourth Amendment to the United States Constitution and Utah Constitution, Article I, Section 14."[23]

¶33 The parties agree that, were Carlson not on the federal task force, as a state officer he would have had to secure a court order to obtain the subscriber records here, as required by EIDPA and the Subpoena Powers Statute.[24] But setting aside Carlson's dual role as a state officer and a federal task force member, we answer a simple question: when Carlson, a state officer, requested that federal officers use their federal authority to obtain subscriber records and then share the records with him, did EIDPA require that those records be excluded in a subsequent state trial?

¶34 After analyzing the statute, we conclude that so long as federal officers lawfully obtain the subscriber records under applicable federal law from a third-party service provider in the first instance, a state law enforcement agency may use those shared records without being subject to EIDPA's exclusionary rule.[25] We then apply that rule to the facts of this case and hold that, because federal officers, acting at Carlson's request, obtained Andrus's subscriber records from the service providers based on lawful federal subpoenas, EIDPA's exclusionary rule did not apply.

> 1. EIDPA Does Not Require Courts to Exclude Evidence Obtained Lawfully by Federal Officers and Provided to State Officers

¶35 To understand whether EIDPA required the trial court to exclude evidence lawfully obtained through the federal subpoenas, we start with the statute itself. "When interpreting a statute, our primary objective is to ascertain the intent of the legislature."[26] We

---

disclosure of subscriber records in certain cases); *id.* § 77-23c-104(4) (2019) (laying out conditions under which law enforcement officers may obtain subscriber records without a warrant).

[23] *Id.* § 77-23c-105 (2019).

[24] *See id.* § 77-22-2.5(2) (2019); *id.* § 77-23c-104(2) (2019).

[25] *See id.* § 77-23c-105 (2019).

[26] *McKitrick v. Gibson*, 2021 UT 48, ¶ 19, 496 P.3d 147 (cleaned up).

start with the statute's text.[27] "But we do not interpret statutory text in isolation."[28] Rather, we interpret the text in context—"including, particularly, the structure and language of the statutory scheme."[29] "When the meaning of a statute can be discerned from its language, no other interpretive tools are needed."[30] But if the "statutory language is ambiguous—in that its terms remain susceptible to two or more reasonable interpretations after we have conducted a plain language analysis—we generally resort to other modes of statutory construction and seek guidance from legislative history and other accepted sources."[31]

¶36 Our analysis requires us to interpret three interrelated parts of the Utah Code: section 77-23c-104 (describing the treatment of subscriber records and incorporating the Subpoena Powers Statute); chapter 22 of title 77 (the Subpoena Powers Statute); and section 77-23c-105 (EIDPA's exclusionary rule).

¶37 Subsection 77-23c-104(2) provides the general rule for subscriber records: "Except as provided in [the Subpoena Powers Statute], a law enforcement agency may not obtain, use, copy, or disclose a subscriber record."[32] Subsection 77-23c-104(4) lists several exceptions to this rule, none of which the parties have asserted here.[33] EIDPA then includes an exclusionary rule:

> All electronic information or data and records of a provider of an electronic communications service or remote computing service pertaining to a subscriber or customer that are obtained in violation of the provisions of this chapter shall be subject to the rules governing exclusion as if the records were obtained in violation of the Fourth Amendment to the United

---

[27] *Id.*

[28] *Id.*

[29] *Id.* (cleaned up).

[30] *Marion Energy, Inc. v. KFJ Ranch P'ship*, 2011 UT 50, ¶ 15, 267 P.3d 863 (cleaned up).

[31] *Id.* (cleaned up).

[32] UTAH CODE § 77-23c-104(2) (2019).

[33] *Id.* § 77-23c-104(4) (2019).

States Constitution and Utah Constitution, Article I, Section 14.[34]

In short, the exclusionary rule applies to all electronic records "of a[] [service provider] pertaining to a subscriber or customer that are obtained in violation of" EIDPA.[35]

¶38 The State argues that these provisions leave ambiguous whether or not EIDPA provides an exclusive path to obtaining subscriber records. The State therefore invites us to interpret EIDPA's scope narrowly. Under its reading, state officers could obtain subscriber records by following the Subpoena Powers Statute, but state officers could also obtain subscriber records by other lawful means, such as from sister jurisdictions or federal officers who lawfully possess the records. In contrast, Andrus argues that in the absence of any textual exceptions allowing state officers to receive subscriber records from federal agencies, EIDPA's text requires courts to suppress any records obtained outside of the EIDPA-endorsed process.

¶39 We begin our analysis by noting that EIDPA does not expressly mention federal officers or discuss cooperation between law enforcement agencies across state lines.[36] It neither provides an exception endorsing the sharing of subscriber records, nor expressly forbids such cross-jurisdictional cooperation. As our dissenting colleague points out, that silence could be read to prevent any such evidence-sharing between state and federal

---

[34] *Id.* § 77-23c-105 (2019).

[35] *Id.*

[36] EIDPA does permit state officers to obtain "stored or transmitted data from an electronic device . . . without a warrant . . . in connection with a report forwarded by the National Center for Missing and Exploited Children" (NCMEC) "under 18 U.S.C. [§] 2258A." *Id.* § 77-23c-102(2)(b)(iii) (2019). That federal statute requires online service providers to report instances of online sexual exploitation of children to the NCMEC, a "private, nonprofit organization" acting as a clearinghouse of information. 18 U.S.C. § 2258A(a), (c). After reviewing each report, NCMEC "shall make available each report" to state, federal, or foreign law enforcement agencies, as appropriate. *Id.* § 2258A(c). But NCMEC is not a federal law enforcement agency. *See id.*

officers.[37] We ultimately conclude that the statute is ambiguous on this point. But given the apparent long-standing practice of cross-jurisdictional cooperation, we conclude that the legislature did not intend to prevent evidence-sharing in cases like this one. "If the legislature wishes otherwise, it is free to amend the statute."[38]

¶40 First, we look to the text. While subsection 77-23c-104(2) bars state law enforcement agencies from "obtain[ing], us[ing], copy[ing], or disclos[ing] a subscriber record," except as laid out in the Subpoena Powers Statute, the exclusionary rule applies only to records "*obtained* in violation" of EIDPA.[39] As Andrus points out, the former language is broad, applying to many forms of police conduct—but the remedy of suppression is comparatively narrow.[40]

¶41 So what *does* trigger the exclusionary rule? We must first determine what the legislature meant by excluding electronic records "of a [service provider] . . . that are obtained in violation of" EIDPA.[41] To obtain means "to gain or attain usually by planned action or effort."[42] And what must state officers gain or attain "in

---

[37] *See infra* ¶¶ 104–08, 115.

[38] *See Mariemont Corp. v. White City Water Improvement Dist.*, 958 P.2d 222, 227 (Utah 1998).

[39] *Compare* UTAH CODE § 77-23c-104(2) (2019), *with id.* § 77-23c-105 (2019) (emphasis added).

[40] We agree with Andrus that the legislature's use of several verbs—"obtain, use, copy, [and] disclose"—indicates that it intended state officers to access subscriber records primarily, if not exclusively, by following the Subpoena Powers Statute. *See id.* § 77-23c-104(2) (2019). But the omission of those same verbs from the exclusionary rule suggests that the legislature intended the strong remedy of exclusion to apply only to records "obtained" contrary to EIDPA. *See id.* § 77-23c-105 (2019). While we must give effect to the use of several verbs in subsection 77-23c-104(2), we also "seek to give effect to omissions in statutory language by presuming all omissions to be purposeful." *McKitrick*, 2021 UT 48, ¶ 37 (cleaned up).

[41] UTAH CODE § 77-23c-105 (2019).

[42] *Obtain*, MERRIAM-WEBSTER, https://www.merriam-webster.com/dictionary/obtain (last visited May 19, 2025).

violation of" EIDPA?[43] Subscriber records "of a [service provider]."[44] Andrus suggests that all subscriber records that come into state officers' hands fit into this category. We agree that this interpretation is plausible. But we also see reasonable alternative meanings in the statutory text.[45]

¶42 "Of" has many meanings.[46] Two definitions appear relevant here: "a function word to indicate origin or derivation" and "a function word to indicate belonging or a possessive relationship."[47] Andrus's reading implies the former—sweeping up any subscriber records created by or derived from the service providers. The State's position looks like the latter—in which case the exclusionary rule applies only when state officers gain access to subscriber records *possessed by* service providers. If, as occurred here, state officers instead obtain records lawfully possessed by federal agencies, EIDPA's exclusionary rule would not apply under the State's reading.[48] Similarly, under that reading, if a state officer

---

[43] *See* UTAH CODE § 77-23c-105 (2019).

[44] *Id.*

[45] *See Marion Energy, Inc.*, 2011 UT 50, ¶ 15 (explaining that "statutory language is ambiguous" when "its terms remain susceptible to two or more reasonable interpretations after we have conducted a plain language analysis").

[46] *See Of*, MERRIAM-WEBSTER, https://www.merriam-webster.com/dictionary/of (last visited May 19, 2025).

[47] *Id.*

[48] As discussed below, *infra* ¶¶ 52–56, we conclude the federal subpoenas at issue here were valid, and thus federal officers lawfully obtained Andrus's subscriber records. *See* 18 U.S.C. §§ 2703(c)(2), 3486(a)(1). We need not determine whether EIDPA would compel exclusion of records *unlawfully* obtained by officers of the federal government or another state and then handed over to Utah officers. Such evidence would likely be excluded as a matter of constitutional law. *See generally Mapp v. Ohio*, 367 U.S. 643, 655–58 (1961) (declaring that the Fourth and Fourteenth Amendments require courts to apply the exclusionary rule to evidence obtained via unconstitutional searches and seizures, even in state court); *see also Elkins v. United States*, 364 U.S. 206, 223–24 (1960) (declaring that the Fourth Amendment requires exclusion in federal court of

(continued . . .)

requests that a federal officer obtain subscriber records from a service provider and then share those records with the state officer, the state officer has obtained records of the federal officers—not records of the service provider—and the exclusionary rule would not apply.

¶43 The text of the exclusionary rule does not tell us which meaning the legislature intended—Andrus's broad interpretation or the State's narrow one. The dissent suggests that interpreting the word "of" consistently throughout the statute rules out the State's reading.[49] But where, as the dissent points out, "of" is a common word with myriad definitions used in myriad contexts, we are not convinced that resolves the ambiguity.[50]

¶44 Andrus supports his narrow reading by arguing that the legislature could have included an exception for records obtained through cooperation with federal officers in section 77-23c-104, but it did not do so. After stating that state officers "may not obtain, use, copy, or disclose a subscriber record" except as permitted by the Subpoena Powers Statute, EIDPA lays out several explicit exceptions, none of which apply here.[51] Andrus argues that the legislature knew how to include exceptions, and it could have included an exception for administrative subpoenas if it wanted to.[52]

¶45 But language within section 77-23c-104 suggests that EIDPA's exceptions are not exhaustive. EIDPA requires state officers to obtain subscriber records "as provided in" the Subpoena

---

evidence obtained unlawfully by state officers and then turned over to federal officers).

[49] *See infra* ¶¶ 117–23.

[50] *See infra* ¶ 118 & n.131 (citing *Of*, MERRIAM-WEBSTER, https://www.merriam-webster.com/dictionary/of (last visited May 19, 2025)).

[51] *See* UTAH CODE § 77-23c-104(2), (4) (2019).

[52] *See Jensen v. Intermountain Healthcare, Inc.*, 2018 UT 27, ¶ 25, 424 P.3d 885 ("We generally assume that each term in the statute was used advisedly, and sometimes find that the use of a term elsewhere shows that the Legislature knows how to use those terms, and would have used them again if it intended the same effect." (cleaned up)).

Powers Statute.[53] EIDPA then states that "[n]otwithstanding" the requirement to follow the Subpoena Powers Statute, "a law enforcement agency may obtain, use, copy, or disclose a subscriber record, or other record or information related to a subscriber or customer, without a warrant" under several enumerated circumstances.[54] But nowhere does the Subpoena Powers Statute discuss obtaining subscriber records by warrant.[55] In stating that under certain circumstances state officers may obtain subscriber records *without* a warrant, the exceptions listed in subsection 77-23c-104(4) suggest that state officers may also obtain subscriber records *with* a warrant—a path not contemplated anywhere in EIDPA or the Subpoena Powers Statute. That the legislature included this language suggests that it did not intend compliance with the Subpoena Powers Statute to be the only way for state officers to lawfully obtain subscriber records.[56]

---

[53] UTAH CODE § 77-23c-104(2) (2019).

[54] *Id.* § 77-23c-104(4) (2019). None of those circumstances apply in this case.

[55] *See generally id.* §§ 77-22-1 to -5 (2019). The Subpoena Powers Statute provides that when investigating certain crimes, including sex crimes, law enforcement officers who suspect that an electronic system was used to commit the crimes must seek a court order requiring the production of relevant subscriber records. *Id.* § 77-22-2.5(2) (2019). The Subpoena Powers Statute does not describe how officers may obtain subscriber records for unenumerated crimes. *See id.* §§ 77-22-2, -2.5 (2019). Presumably, officers may obtain such evidence subject to the ordinary subpoena process laid out in the statute. *See id.* § 77-22-2 (2019).

[56] *See id.* § 77-23c-104(2), (4) (2019). The dissent points out that the legislature has since amended this provision to provide that "a law enforcement agency may obtain, use, copy, or disclose a subscriber record, or other record or information related to a subscriber or customer, without an investigative subpoena or a warrant" under enumerated circumstances. *See infra* n.123 (cleaned up) (quoting UTAH CODE § 77-23c-104(4) (2025)). But subsequent legislative amendments can always cut both ways, indicating either a change in the law or a clarification of the law as it always was. *See Hutter v. Dig-It, Inc.*, 2009 UT 69, ¶ 16, 219 P.3d 918. Here, we find no indication of the legislature's intent in passing the subsequent

(continued . . .)

¶46   We also find instructive the "interpretive principle . . . that the [l]egislature does not normally hide elephants in mouseholes."[57] "That is to say that we don't normally expect major changes to the established legal landscape" without "textual clues about [the legislature's] intent."[58] As the record demonstrates in this case, state officers regularly collaborate with federal officers through state-federal task forces to investigate offenses over which there is concurrent state and federal jurisdiction.[59] Detective Carlson testified that he coordinates with CETF "on a daily, weekly occurrence." And asking federal members of the task force to send subpoenas in an investigation "was pretty standard procedure." The FBI administrative assistant who helped Carlson here testified that the task force included twenty-five to thirty state officers from whom she received three to four requests for subpoenas every day.

¶47  Andrus's reading would discourage this type of state-federal or interstate cooperation and would instead require state officers to pursue a separate state process to acquire information that federal officers had already lawfully obtained. While it may be possible for state officers to independently obtain the subscriber records from a service provider, the same may not be true of other evidence gathered in reliance on federally obtained subscriber information. As Andrus points out, because EIDPA "incorporates the Fourth Amendment exclusionary rule," it arguably "requires exclusion not only of the records themselves, but of the evidence derived therefrom." If EIDPA's exclusionary rule applies to subscriber records lawfully obtained by a federal law enforcement agency and an arrest or search warrant has been issued based on that information, any statements made at the time of the suspect's arrest or evidence seized during the search might be inadmissible

---

amendment and find it of little help in interpreting the original statute.

[57] *Burton v. Chen*, 2023 UT 14, ¶ 40 n.5, 532 P.3d 1005 (cleaned up).

[58] *Id.*

[59] *See Frequently Asked Questions: Do FBI agents work with state, local, or other law enforcement officers on "task forces"?*, FBI, https://www.fbi.gov/about/faqs/do-fbi-agents-work-with-state-local-or-other-law-enforcement-officers-on-task-forces (last visited May 19, 2025).

in any future state prosecution as fruit of the poisonous tree.[60] While the legislature could certainly enact such a change, we would expect to see a clearer indication that the legislature intended to bar evidence obtained through lawful federal procedures in the statutory language.[61]

¶48   Taken together, these different statutory features convince us that EIDPA is ambiguous about whether its procedure is exclusive—that is, the only procedure by which state officers may obtain subscriber records for admission in criminal proceedings. So we turn to the legislative history for clues about the legislature's intent.[62]

¶49   As with the text, we find nowhere in the legislative history that any single legislator—let alone the body speaking as a whole— expressly stated how EIDPA would affect evidence-sharing between state and federal law enforcement agencies. We find no discussion of the issue.

¶50   At multiple points in the legislative process, bill sponsor Representative Craig Hall asserted that "[t]he intention of this bill" was "to make clear that the protections in place for the paper world are also in place for the electronic world."[63] We can find no law in Utah preventing state law enforcement officers from using paper records or other physical evidence lawfully obtained by the federal

---

[60] *See Segura v. United States*, 468 U.S. 796, 804 (1984) "[T]he exclusionary rule reaches not only primary evidence obtained as a direct result of an illegal search or seizure, but also evidence later discovered and found to be derivative of an illegality or fruit of the poisonous tree." (cleaned up)).

[61] *See Burton*, 2023 UT 14, ¶ 40 n.5.

[62] *See Marion Energy, Inc.*, 2011 UT 50, ¶ 15.

[63] House Jud. Comm., H.B. 57, 2019 Leg., Gen. Sess. (Jan. 31, 2019), https://le.utah.gov/av/committeeArchive.jsp?timelineID= 127100; *see also* House Jud. Comm., H.B. 57, 2019 Leg., Gen. Sess. (Feb. 12, 2019), https://le.utah.gov/av/committeeArchive.jsp? timelineID=131794; House Floor Debate, H.B. 57, 2019 Leg., Gen. Sess. (Feb. 22, 2019), https://le.utah.gov/av/floorArchive.jsp? markerID=106441; Sen. Jud., L. Enf't, & Crim. Just. Comm., H.B. 57, 2019 Leg., Gen. Sess. (Mar. 4, 2019), https://le.utah.gov/av/ committeeArchive.jsp?timelineID=137676.

government or agencies of other states and then handed over to Utah officers.[64] This suggests that the legislature did not intend for EIDPA to provide broader protection for *electronic* records obtained in federal investigations and then provided to state officers.

¶51 Based on the legislative history and the statutory language, we conclude that the legislature intended the narrower rule here. Though EIDPA's statutory text is ambiguous, we read the exclusionary rule to require suppression only if state officers obtain subscriber records directly from a service provider without following the process laid out in the Subpoena Powers Statute. To state the inverse, if state officers obtain subscriber records from federal officers or officers of another state who lawfully obtained the records from the service provider, state officers may rely on those records without triggering EIDPA's exclusionary rule. And, as occurred here, if state officers request that federal officers use their federal authority to obtain subscriber records and share those records with the state officers, EIDPA does not require exclusion of the records in state court.[65]

### 2. EIDPA Did Not Require Exclusion Here Because Federal Officers Obtained the Subscriber Records Through Valid Federal Subpoenas

¶52 We turn now to applying the exclusionary rule to the facts of this case. Both parties agree that Carlson, a state officer, requested that federal officers issue federal administrative subpoenas to procure Andrus's subscriber records and then share those records with state officers. But the parties disagree about whether those federal subpoenas were valid under federal law. Under the rule we announced above, if the federal officers, acting at Carlson's request, lawfully obtained the subscriber records from

---

[64] *Cf. Elkins*, 364 U.S. at 223–24 (holding that the Fourth Amendment requires courts to exclude evidence unlawfully obtained by state agents and then handed over to federal agents).

[65] Our interpretation turns on the language excluding subscriber records "of a [service provider] . . . that are obtained in violation of" EIDPA. *See* UTAH CODE § 77-23c-105 (2019). We see no basis in that language to consider the subjective mental state of the federal officers, who may obtain records either independently or at the request of their state counterparts. And we decline to write a standard into the statute that is not rooted in its plain text.

service providers under federal law, EIDPA would not exclude the records in state court.

¶53   Federal law provides that "[i]n any investigation of . . . a Federal offense involving the sexual exploitation or abuse of children, the Attorney General . . . may issue in writing and cause to be served a subpoena requiring the production" of evidence, including records and testimony.[66] Andrus asserts that this was primarily, if not exclusively, a state investigation—federal officers never opened a federal investigation into the crimes, federal officers did not refer the crimes to a federal prosecutor, and the subpoenas do not list any specific federal offenses. He thus argues that the federal subpoenas were invalid under this provision. Andrus also emphasizes that Carlson knew he could have obtained the subscriber records by cooperating with the Davis County Attorney's Office, but he chose to seek a federal subpoena merely because the process was faster.

¶54   While we recognize the complexities raised by Carlson's dual role as state officer and federal task force member, the plain text of the federal statute tells us that we need not probe into the subjective intent of any officer seeking or issuing a subpoena. Rather, we determine the validity of this subpoena by asking whether there was an investigation of "a [f]ederal offense involving the sexual exploitation or abuse of children" here.[67]

¶55   As the trial court noted in its order, the statutory text does not limit "investigation" to only federal investigations by federal officers. Rather, the limiting principle comes from the *offense* being investigated.[68] And Andrus conceded below that the investigation here involved potential federal offenses—including child enticement and possession of child pornography. The statute authorizing the subpoenas lists both as qualifying "offense[s] involving the sexual exploitation or abuse of children."[69] Accordingly,      because      federal      officers—including      the

---

[66] 18 U.S.C. § 3486(a)(1)(A).

[67] *See id.* § 3486(a)(1)(A)(i)(II).

[68] *See id.*

[69]   *Id.* § 3486(a)(1)(D)(i); *see also id.* § 2422(b) (defining enticement); *id.* § 2252A(a)(2) (defining receipt of child pornography).

administrative assistant who helped Carlson and the special agent who signed the subpoenas—sought the subpoenas in order to investigate potential federal crimes, the subpoenas were valid under federal law.[70]

¶56 Applying the test we laid out above,[71] because the administrative subpoenas here were valid under federal law, federal officers permissibly used them to obtain Andrus's subscriber records from the service providers. And EIDPA did not compel the records' exclusion once federal officers shared them with state officer Carlson. The trial court thus properly rejected Andrus's motion to suppress this evidence on statutory grounds.

### B. Andrus Has Not Demonstrated that the Utah Constitution Requires Suppression of the Fruits of Valid Federal Subpoenas

¶57 In addition to his statutory challenge, Andrus also argues that article I, section 14 of the Utah Constitution required the trial court to suppress the evidence obtained through the federal subpoenas. Article I, section 14 of the Utah Constitution states that "[t]he right of the people to be secure in their persons, houses, papers and effects against unreasonable searches and seizures shall not be violated." In evaluating an alleged violation of this right, this court considers first whether an individual has a reasonable expectation of privacy in the place or items being searched or seized.[72] If there was a reasonable expectation of privacy, we next consider whether a given search or seizure was reasonable.[73]

---

[70] Andrus also argues in a footnote that the subpoenas were signed by a Supervisory Special Agent, rather than someone he asserts was authorized to sign such subpoenas. But Andrus does not ask us to reverse the trial court's order on this basis, and the lack of development on brief or at oral argument on this issue counsels us against doing so. *See* UTAH R. APP. P. 24(a)(8) ("The argument [in a principal brief] must explain, with reasoned analysis supported by citations to legal authority and the record, why the party should prevail on appeal."). Accordingly, we decline to address the issue.

[71] *See supra* Part I.A.1.

[72] *See State v. Thompson*, 810 P.2d 415, 417–18 (Utah 1991).

[73] *See id.* at 418.

¶58 Here, we need not determine whether Andrus had any reasonable expectation of privacy in his subscriber records, because Andrus has not persuaded us that the search was constitutionally unreasonable. Rather, he concedes that a search is reasonable so long as "the state acts under a *valid* warrant or subpoena."[74] He argues only that the subpoena was illegal under federal and state law. And as we established above, the subpoena here was valid under federal law and did not violate EIDPA.[75] As presented, Andrus's constitutional claim thus fails, and we affirm the order of the trial court denying his motion to suppress.

II. THE TRIAL COURT IMPROPERLY DENIED ANDRUS'S MOTION TO ARREST JUDGMENT FOR HIS HUMAN TRAFFICKING CONVICTION, BUT PROPERLY DENIED THE MOTION AS TO THE SEXUAL EXPLOITATION CONVICTION

¶59 In addition to his challenges to the denial of his motion to suppress, Andrus challenges the trial court's denial of his motion to arrest judgment on his convictions for human trafficking and sexual exploitation. In reviewing a trial court's ruling on a motion to arrest judgment, "[w]e review the evidence presented at trial in a light most favorable to the verdict."[76] We reverse a jury verdict "only if the evidence presented at trial is so insufficient that reasonable minds could not have reached the verdict."[77] But when a fact finder could reasonably find "all required elements of the crime . . . from the evidence, including the reasonable inferences that can be drawn from it, we stop our inquiry and sustain the verdict."[78] We conclude that the trial court erred in denying Andrus's motion as to the human trafficking charge, but affirm his conviction for sexual exploitation of a child.

A. *The Evidence Was Insufficient to Sustain Andrus's Conviction for Human Trafficking of a Child*

¶60 We first consider whether the evidence was so insufficient that the jury could not have found Andrus guilty of human

---

[74] (Quoting *Schroeder v. Utah Atty. Gen.'s Off.*, 2015 UT 77, ¶ 22, 358 P.3d 1075 (emphasis in brief).)

[75] *Supra* ¶¶ 55–56.

[76] *State v. Colwell*, 2000 UT 8, ¶ 42, 994 P.2d 177.

[77] *Id.*

[78] *Id.*

trafficking of a child. At the time of Andrus's offenses, a person who "recruit[ed], harbor[ed], transport[ed], obtain[ed], patronize[d], or solicit[ed] a child for sexual exploitation or forced labor" committed human trafficking of a child.[79] "[S]exual exploitation" included "all forms of commercial sexual activity with a child," in turn defined as "any sexual act with a child, on account of which anything of value is given to or received by any person."[80]

¶61 Andrus primarily argues that the evidence here failed to show that "anything of value was given [to] or received by" Laura. Instead, he points out that Laura testified only that Andrus *offered* her things—including money, a car, and a place to live—but not that she ever received those benefits. He asserts that the marijuana he gave Laura at their first meeting, after Laura touched him sexually, did not qualify as anything of value. And, he claims, the State failed to prove that the marijuana she did receive was in return for the sexual act.

¶62 The State points out that under the statute, a person may be found guilty for "solicit[ing]" a child for sexual exploitation, not merely "obtain[ing]" or "patroniz[ing]" the child for commercial sexual activity.[81] The State argues that the inclusion of "solicit" in the statute means that "[t]here is no statutory requirement that child sexual exploitation actually occur." Thus, the State asserts, the statute requires no actual transfer of value—a mere offer is enough.

¶63 Neither this provision nor chapter 5 of title 76 define "solicit."[82] For an ordinary criminal solicitation conviction, to "[s]olicit" is "to ask, command, encourage, importune, offer to hire,

---

[79] UTAH CODE § 76-5-308.5(2) (2019). The legislature has since amended the human trafficking of a child statute; this opinion references the 2019 version, which was in effect at the time of Andrus's illicit relationship with Laura. *See State v. Clark*, 2011 UT 23, ¶ 13, 251 P.3d 829.

[80] UTAH CODE § 76-5-308.5(1), (3)(b) (2019).

[81] *Id.* § 76-5.308.5(2) (2019).

[82] *See id.*; *id.* §§ 76-5-101 to -704.

or request."[83] But relying on the statutory actus reus of solicitation, as the State suggests, does not answer whether something of value must in fact be given or received. Stringing together the various provisions in section 76-5-308.5, the plain language permits a conviction for asking, commanding, or requesting "any sexual act with a child, on account of which anything of value is given to or received by any person."[84] The dictionary definition does not tell us whether "solicit" extends to only the first element—the sexual act—or also reaches the second element—the exchange of value. In other words, knowing the meaning of "solicit" does not tell us whether a mere offer to give or receive something of value is enough for a conviction. To clarify the meaning of this language, we must turn to other tools of statutory interpretation.

¶64  When we construe a statute, "our overarching goal is to implement the intent of the legislature."[85] "Our first undertaking in this regard is to assess the language and structure of the statute."[86] In doing so, "we read the plain language of the statute as a whole, and interpret its provisions in harmony with other statutes in the same chapter and related chapters, avoiding any interpretation which renders parts or words in a statute inoperative or superfluous."[87]

¶65 Reading the human trafficking of a child provision alongside the statute defining sexual solicitation, section 76-10-1313, persuades us that something of value actually must have been exchanged for the State to secure a conviction for human trafficking of a child. At the time of the offenses, section 76-10-1313 prohibited "offer[ing] or agree[ing] to commit any sexual activity with another individual for a fee, or the functional equivalent of a

---

[83] *Id.* §§ 76-4-203(1)(a)(ii), -205(1)(a)(ii). This matches the most general definition of solicitation in Black's Law Dictionary: "The act or an instance of requesting or seeking to obtain something; a request or petition." *Solicitation*, BLACK'S LAW DICTIONARY (12th ed. 2024).

[84] UTAH CODE § 76.5-308.5(1), (2), (3)(b) (2019).

[85] *State v. Rushton*, 2017 UT 21, ¶ 11, 395 P.3d 92.

[86] *Id.*

[87] *Id.* (cleaned up).

fee."[88] Subsection (5) of the statute elevated the offense to a third-degree felony when the solicitation involved a child—unless the solicitation rose to the level of seriousness defined in the adult human trafficking or aggravated human trafficking statutes.[89] Unlike the sexual solicitation statute, a conviction under the adult human trafficking statute requires proof of force, fraud, or coercion—a much higher burden to secure a conviction.[90] This suggests that the legislature intended most cases involving an offer of payment for sexual activity with a child to be prosecuted as sexual solicitation, a third-degree felony, rather than as human trafficking.

¶66 Subsequent legislative changes reinforce our conclusion. In 2022, the legislature amended subsection 76-10-1313(5)(a) to specify that sexual solicitation of a child "is a second degree felony if the solicitation does not amount to a violation of" the human trafficking of a child statute, section 76-5-308.5.[91] This distinction between second-degree felony solicitation and first-degree felony human trafficking of a child suggests that the legislature meant for the two crimes to be treated differently.[92]

¶67 Interpreting the human trafficking of a child statute to apply to mere offers of value would blur the line between the two offenses, rendering the sexual solicitation of a child statute superfluous. To preserve the distinction, we conclude that a conviction for human trafficking of a child requires proof that

---

[88] UTAH CODE § 76-10-1313(1)(a) (2019). We again refer to the 2019 version, the one in effect at the time of the offenses, unless otherwise noted. *See Clark*, 2011 UT 23, ¶ 13.

[89] UTAH CODE § 76-10-1313(5) (2019).

[90] *Id.* § 76-5-308(1) (2019). The aggravated human trafficking statute imposes even heftier requirements. *See id.* § 76-5-310 (2019).

[91] Sexual Solicitation Amendments, H.B. 81 § 4, 2022 Leg., Gen. Sess. (Utah 2022). At trial, both parties and the trial court seemed to agree that the provision referencing the adult human trafficking statute was an error that the legislature corrected through the 2022 legislation.

[92] *See* UTAH CODE § 76-5-308.5(3) (2025); *id.* § 76-10-1313(5)(a) (2025).

something of value has actually been given or received, not merely offered.

¶68 Here, the evidence showed that while Andrus offered Laura lavish gifts in exchange for various sexual acts, he only gave her marijuana.[93] Laura testified that he brought marijuana to their first meeting, which she smoked following their first sexual encounter. She also mentioned that he brought marijuana on at least one other occasion when they met up in the same parking lot. We need not decide whether the marijuana had value, because the evidence was insufficient to permit a jury to conclude that he gave her the marijuana "on account of" any sexual act—in other words, in exchange for or because of a sexual favor.

¶69 While Andrus gave Laura marijuana after she touched his "groin," which she then smoked, nothing indicates that Andrus promised Laura marijuana either before or during their meeting or that her smoking was more than incidental. Laura testified that Andrus did not say anything about what the marijuana was for, and that she did not recall whether she had talked with Andrus about marijuana before they met up. Similarly, Laura testified that Andrus brought her marijuana on another occasion, but she did not recall whether he told her ahead of time that he planned to bring it or provide any testimony that the marijuana was given in exchange for the sexual activity. In the absence of any credible evidence suggesting a relationship between the sexual acts and the marijuana, no reasonable jury could conclude beyond a reasonable doubt that the marijuana was given or received on account of a sexual act.[94] Thus, the trial court erred when it denied Andrus's

---

[93] Laura also testified about receiving marijuana and alcohol in a later encounter in Summit County, and she described receiving cartridges of THC from Andrus. *See supra* n.6. The location of that later gift was ambiguous, but her testimony suggests that it also occurred in Summit County. Andrus's conduct in Summit County was not charged in this case, and we do not rely on it here.

[94] The State asserts that Andrus's later offers of more marijuana, money, and other gifts are circumstantial evidence that Andrus intended the marijuana he gave to Laura to be in exchange for the sexual act. In particular, the State highlights Laura's statements that Andrus would ask for sexual acts in return for the things he offered her, though not always "at that very moment." She gave as an

(continued . . .)

motion to arrest judgment on this charge, and we vacate his conviction.

### B. A Reasonable Jury Could Find that Andrus Committed Sexual Exploitation of a Child

¶70   Andrus also claims that the trial court erred in declining to arrest judgment on his conviction for sexual exploitation of a minor. At the time of the offenses, a person committed sexual exploitation of a minor "when the person . . . knowingly produce[d] . . . child pornography."[95] "Produce" includes "photographing, filming, taping, directing, producing, creating, designing, or composing."[96] And "[c]hild pornography" includes "any visual depiction, including any live performance, photograph, film, video, picture, or computer or computer-generated image or picture, . . . of sexually explicit conduct, where . . . the production of the visual depiction involves the use of a minor engaging in sexually explicit conduct" or "the visual depiction is of a minor engaging in sexually explicit conduct."[97] "Sexually explicit conduct" includes both "actual or simulated . . . lascivious exhibition of the genitals, pubic region, buttocks, or female breast of any person" and "actual or simulated . . . masturbation."[98] The parties stipulated to the jury instruction the court provided, instructing the jury to find Andrus guilty if he

---

example that "when he wanted [her] to live with him, he would mention that [they] would be doing sexual acts a lot." And once, when she declined sex, "he had offered [her] some thousands of dollars for [her] to continu[e] doing acts with him." But these much-later interactions do not support a reasonable inference that early in their relationship, Andrus gave Laura the marijuana in exchange for her touching him, rather than gratuitously.

[95] UTAH CODE § 76-5b-201(1) (2019). We refer to the 2019 statute throughout our discussion, the version in effect at the time of the offenses. *See Clark*, 2011 UT 23, ¶ 13. We note that the statute also permits a conviction for possession or intentional distribution or viewing of child pornography, but the jury here was instructed only to consider knowing production.

[96] UTAH CODE § 76-5b-103(9)(a) (2019).

[97] *Id.* § 76-5b-103(1) (2019).

[98] *Id.* § 76-5b-103(10)(b), (e) (2019).

did "[k]nowingly produce child pornography"; "[t]o wit: [he] directed [Laura] to create sexually explicit images of herself."[99]

¶71 The State argues the evidence was sufficient to convict Andrus of sexual exploitation of a child based on both nude still photographs that Laura sent to Andrus and live-streamed video encounters in which Andrus directed Laura to masturbate for him. Andrus argues that the State cannot rest the conviction on the videos, because, based on jury unanimity principles, the State elected to rely on the still photos alone. And he asserts that the State failed to prove that Laura created the explicit photos at his direction, rather than merely sending him pictures she already had on hand. Assuming without deciding that Andrus's conviction could only turn on the still photographs and viewing the evidence in the light most favorable to the verdict, a reasonable jury could have concluded that Andrus committed sexual exploitation of a minor when he directed Laura to send him nude photographs of herself.[100]

¶72 Laura testified that during their relationship, she and Andrus had conversations over Snapchat about "sexual stuff."

---

[99] Based on the statutory definitions, it is not immediately clear that directing someone to create explicit images qualifies as "directing" under the statute. *See Direct*, MERRIAM-WEBSTER, https://www.merriam-webster.com/dictionary/direct (last visited May 19, 2025) (listing many definitions including (1) "to regulate the activities or course of"; (2) "to carry out the organizing, energizing, and supervising of"; (3) "to train and lead performances of"; and (4) "to request or enjoin . . . with authority"). But both parties stipulated to the jury instructions here, and Andrus does not challenge the jury instructions themselves on appeal. Accordingly, we assume without deciding that the jury instructions were a correct reflection of the law for purposes of this appeal. *See State v. Johnson*, 2017 UT 76, ¶¶ 47–53, 416 P.3d 443 (describing the "limited circumstances" in which an appellate court will reach an issue *sua sponte* that was unpreserved at trial and waived on appeal).

[100] *See State v. Stricklan*, 2020 UT 65, ¶ 30, 477 P.3d 1251 ("[A] defendant seeking a directed verdict must show that, when viewed in the light most favorable to the State, no evidence existed from which a reasonable jury could find beyond a reasonable doubt that the defendant committed the crime." (cleaned up)).

Andrus asked her for "nude photos" and said "[h]e wanted to ejaculate to them." Laura then testified that she sent him nude photos in response to his requests.

¶73 Though she did not testify directly about creating the photographs, a reasonable jury could infer from the evidence that Laura took nude photographs to send to Andrus, per his request, as opposed to merely sending him nude photographs that she had already independently taken and kept on hand. That inference is supported by the text messages that Andrus sent to Laura after their relationship had ended, which Vance screenshotted during an interview with Laura. In the texts, Andrus made several explicit references to sexual acts. Andrus also asked Laura for "some sexy pics." When Laura said she was at school—suggesting she could not take a new photo—he asked if she had "[a]ny saved," adding that "[n]ot even nude is ok." After Laura replied that she had deleted her photos because she "got [her] phone checked," Andrus persisted, asking for another picture, "like a snap of you today."

¶74 These messages support a reasonable inference that in asking for explicit photos, Andrus was directing Laura to create new pictures for him, not just asking her to send him pictures that she already had on hand. And the jury could reasonably conclude that when Laura had complied with Andrus's earlier requests for explicit photos, she had created those photos at Andrus's direction. Thus, the trial court did not err in denying Andrus's motion to arrest judgment on the sexual exploitation of a child count.

III. THE TRIAL COURT PROPERLY DENIED ANDRUS'S MOTION FOR A
    DIRECTED VERDICT ON THE DISTRIBUTION OF MARIJUANA CHARGE

¶75 Andrus next challenges the trial court's denial of his motion for a directed verdict on the distribution of a controlled substance charge. He argues that a conviction cannot rest solely on Laura's lay testimony that he gave her marijuana without either scientific evidence identifying the substance or an independent foundation about Laura's knowledge of marijuana.

¶76 In late 2019, Utah Code section 58-37-8 made it "unlawful for a person to knowingly and intentionally . . . distribute a controlled or counterfeit substance, or to . . . offer . . . to distribute a

controlled or counterfeit substance."[101] Marijuana is one such controlled substance.[102]

¶77 Here, Laura testified that at her first encounter with Andrus, he gave her marijuana, and she smoked it. The State provided no physical evidence or scientific testing to show that the substance she received was in fact marijuana. Elsewhere in her testimony, she described smoking marijuana at a friend's house. And on cross-examination, Vance agreed with counsel's description that Laura was at a friend's house and was "high" on marijuana at the time she first contacted Andrus. Laura also testified that Andrus offered her marijuana on other, unspecified occasions, and that she smoked marijuana with Andrus at his house in Summit County.

¶78 The State asserts that the testimony proves that Laura recognized marijuana's appearance and effects, and thus a reasonable jury could rely on her testimony to find that Andrus gave her marijuana. Andrus argues that Laura's lay testimony alone could not prove the identity of the substance she received. A trial court may grant "a directed verdict only if, examining all evidence in a light most favorable to the non-moving party, . . . no competent evidence . . . would support a verdict in the non-moving party's favor."[103]

¶79 Andrus points us to two court of appeals decisions, which, he suggests, show that the trial court erred in denying his motion for a directed verdict.[104] In both cases, the court of appeals considered the minimum amount of evidence necessary to affirm a jury verdict for possession of a controlled substance without chemical testing to prove the substance's identity.[105] We need not establish today a holistic framework for evaluating such cases.

---

[101] UTAH CODE § 58-37-8(1)(a)(ii) (2019). We again refer to the offense as it existed at the time of the crime. *See State v. Clark*, 2011 UT 23, ¶ 13, 251 P.3d 829.

[102] UTAH CODE § 58-37-8(1)(b)(ii) (2019).

[103] *State v. Garcia*, 2017 UT 53, ¶ 62, 424 P.3d 171 (cleaned up).

[104] *See Provo City Corp. v. Spotts*, 861 P.2d 437 (Utah Ct. App. 1993); *In re C.P.B.*, 2012 UT App 174, 282 P.3d 1023.

[105] *Spotts*, 861 P.2d at 443; *In re C.P.B.*, 2012 UT App 174, ¶¶ 5–6.

Rather, we consider only whether *any* competent evidence supports the jury's guilty verdict.[106]

¶80 Laura testified that she had used marijuana before, and she told police officers that she had been "high," supporting a reasonable inference that she was familiar with marijuana's appearance and effects. She then testified to receiving marijuana from Andrus on the day they first met and again later in their relationship. Though she identified the marijuana by name, she provided no detail about how she knew it was marijuana—not what it looked like, how it smelled, how Andrus referred to it, nor how it made her feel when she used it. But under the exacting standard of review for a jury verdict, we cannot conclude that "no competent evidence" in the record showed that the substance was marijuana.[107] While the State carries a heavy burden of proof at trial to prove every element—and ideally would have further questioned Laura here—reasonable jurors could use their common sense to infer that Laura had enough experience to recognize marijuana when she saw and smoked it. Accordingly, we affirm the trial court's decision to deny the motion for a directed verdict.

IV. THE TRIAL COURT DID NOT ERR IN ADMITTING THE SUMMIT COUNTY EVIDENCE, OR ITS ADMISSION WAS HARMLESS

¶81 Finally, we turn to Andrus's challenges to the admission of evidence about his uncharged activity in Summit County. Specifically, Andrus challenges the admission of "evidence that Laura had sex with [him] in his Summit County house," evidence that he "gave her alcohol and marijuana," and "evidence of the search of [Andrus]'s house that occurred one year after the Summit County incident, where police found Laura's underwear, an alcohol flask, cartridges for an electronic cigarette, and a substance that the police believed was marijuana." Andrus asserts that the trial court should have excluded this evidence under rule 404(b) of the Utah Rules of Evidence.

¶82 In reviewing the admission of evidence under rule 404(b), we defer to the judgment of the trial court unless it has abused its discretion.[108]

---

[106] *See Garcia*, 2017 UT 53, ¶ 62.

[107] *See id.* (cleaned up).

[108] *State v. Thornton*, 2017 UT 9, ¶ 56, 391 P.3d 1016.

¶83 Rule 404(b) states that "[e]vidence of a crime, wrong, or other act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in conformity with the character."[109] Even so, this other-acts evidence "may be admissible for another purpose, such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident."[110]

¶84 The State asserts the challenged evidence was admissible without undergoing a rule 404(b) analysis because it was intrinsic to the charged crimes and was not evidence of "other acts."[111] In the alternative, the State asserts the evidence was "introduced for a legitimate, noncharacter purpose" under rule 404(b).[112]

¶85 Here, upon reviewing each piece of evidence to which Andrus objected, we conclude that the trial court did not abuse its discretion in admitting the evidence, or that its admission, if erroneous, did not prejudice Andrus. We first consider Laura's testimony about sexual activity in Summit County along with the physical evidence of her underwear, which police officers discovered in their search of Andrus's house. Then, we analyze Laura's testimony that Andrus provided her alcohol and marijuana at his house, and the evidence that the officers discovered alcohol, marijuana, and electronic cigarette cartridges there a year later.

*A. The Trial Court Properly Admitted Laura's Testimony About Sexual Activity in Summit County and the Location of Her Underwear*

¶86 We first evaluate whether the trial court properly admitted Laura's testimony that at the end of their relationship, Andrus invited her to his house in Summit County, where they had sex. Laura testified that following that encounter, she unintentionally left behind a pair of underwear. Investigators found the underwear while searching Andrus's Summit County home.

---

[109] UTAH R. EVID. 404(b)(1).

[110] *Id.* R. 404(b)(2).

[111] *See State v. Lucero*, 2014 UT 15, ¶ 14 n.7, 328 P.3d 841 ("[R]ule 404(b) applies only to evidence that is *extrinsic* to the crime charged . . . because rule 404(b) applies only to 'other acts.'" (cleaned up)), *abrogated on other grounds by Thornton*, 2017 UT 9, ¶¶ 39, 53–54.

[112] *Id.* ¶ 14.

¶87 Assuming without deciding that the evidence was extrinsic, we conclude the trial court did not abuse its discretion in admitting the evidence. The underwear linked Andrus to Timothy, the only physical evidence connecting him to his online alias. That evidence had direct bearing on Andrus's identity, a permissible purpose under rule 404(b).[113] And the jury needed to hear Laura's testimony to understand how the underwear ended up at Andrus's house in the first place. Because the evidence served "a legitimate, non-character purpose," the trial court did not abuse its discretion in admitting it.[114]

### B. The Trial Court's Admission of Evidence About Drugs and Alcohol Used and Found in Summit County Was Harmless

¶88 We now turn to the evidence related to alcohol and marijuana—both Laura's testimony that Andrus provided her alcohol and marijuana when she visited his Summit County home, and the physical evidence of alcohol, marijuana, and electronic cigarette cartridges discovered in his home in the search a year later. Laura testified that when she met Andrus at his house, he gave her marijuana and alcohol. Vance testified that Laura told police officers that "she had been provided with alcohol and described the bottle as a flask shape with a red cap." Laura also said the alcohol was eighty-proof vodka. Then, upon a search of Andrus's home about a year later, the officers found eighty-proof "vodka that was flask shaped, and had a red label and a white cap." They also found marijuana and electronic cigarette cartridges that Laura said looked like the ones Andrus had given her.

¶89 We assume without deciding that the court erred in admitting this evidence, because we conclude that any such error did not prejudice Andrus. "An error is harmful if it is reasonably likely that the error affected the outcome of the proceedings. In other words, for an error to require reversal, the likelihood of a different outcome must be sufficiently high to undermine confidence in the verdict."[115] We are not convinced that any alleged error here rose to that level.

---

[113] UTAH R. EVID. 404(b).

[114] *Lucero*, 2014 UT 15, ¶ 14.

[115] *State v. Richardson*, 2013 UT 50, ¶ 40 & n.8, 308 P.3d 526 (cleaned up).

¶90   As an initial matter, the jury was instructed that "[w]hile [it could] consider evidence from [Summit County] to support the charged offenses, the acts charged must be found to have occurred in Davis County." "[W]e presume that a jury follows the instructions given . . . ."[116] As Andrus has not pointed to evidence to the contrary, we presume that the jury used the Summit County evidence only for corroboration, and did not rely on Laura's testimony that Andrus gave her marijuana at his home as proving an element of the distribution of a controlled substance charge.

¶91   The challenged evidence here may have bolstered Laura's credibility by corroborating details in Laura's testimony. But Laura's testimony about her ongoing relationship with Andrus was already strongly corroborated by the sexual text messages Andrus sent her and the underwear found in Andrus's home. Her testimony about receiving marijuana from Andrus was also corroborated by Andrus's later text messages asking if she "still use[d] puff bars" and if they could "hang out sometime and smoke." In light of this other evidence, the additional corroboration provided by the challenged Summit County evidence had no reasonable likelihood of influencing the jury's verdict.[117]

¶92   The challenged evidence also had some bearing on the question of Andrus's identity. But that evidence of identity was cumulative after Laura identified Andrus in court as Timothy and police officers described their methodical process to track him down electronically. Given that other evidence tying Andrus to the offenses, it is highly unlikely that the challenged evidence affected the jury's verdict.[118]

¶93   Finally, any improper character inference the jury could have made from the acts of possessing alcohol, marijuana, and electronic cigarette cartridges likely did not impact the jury's judgment of Andrus given that it had already heard Laura's testimony about their ongoing illicit relationship and seen the explicit text messages Andrus sent her. Even assuming the court erred in admitting this evidence, it is not reasonably likely that it caused the jury to reach a different verdict. We conclude that any

---

[116] *State v. Chadwick*, 2024 UT 34, ¶ 42, 554 P.3d 1098.

[117] *See Richardson*, 2013 UT 50, ¶ 40 & n.8.

[118] *See id.*

error did not affect the outcome of the proceedings and does not undermine our confidence in the jury's verdict.[119]

## CONCLUSION

¶94  Andrus raises several challenges to his convictions arising from his sexual relationship with an underage girl. First, he asserts that EIDPA and the Utah Constitution required suppression of electronic records about him. But because we determine that federal officers obtained those records based on lawful federal subpoenas, and then shared the records with state officers, we conclude that EIDPA did not require suppression of the records or any derivative evidence. Nor has Andrus persuaded us that the Utah Constitution was violated here.

¶95  We also reject most, but not all, of Andrus's assertions that the evidence was insufficient to support his convictions. We hold that the human trafficking of a child statute requires the State to prove that something of value was given or received in exchange for a sexual act, not merely that something of value was offered. Accordingly, we vacate Andrus's conviction for human trafficking of a child. But the evidence is sufficient to affirm his convictions for sexual exploitation of a minor and distribution of a controlled substance.

¶96  Finally, we reject Andrus's challenge under rule 404(b) of the Utah Rules of Evidence to the admission of evidence related to his uncharged conduct in a different county. We conclude that the court properly admitted some of the challenged evidence and that admission of the remainder was harmless.

¶97 We therefore vacate Andrus's conviction for human trafficking of a child and affirm his remaining convictions.

————————

[119] *See id.*

35

JUSTICE POHLMAN, concurring in part and dissenting in part from the Opinion of the Court:

¶98  I agree with and concur in the majority's analysis on all issues but one. I respectfully disagree with its interpretation of EIDPA in Part I.A. of the opinion. In my view, Andrus's subscriber records should have been suppressed by the trial court because the State violated EIDPA when Carlson obtained those records without following the procedures laid out in Utah's Subpoena Powers Statute.

¶99  As framed by the majority, the relevant question is this: "[W]hen Carlson, a state officer, requested that federal officers use their federal authority to obtain subscriber records and then share the records with him, did EIDPA require that those records be excluded in a subsequent state trial?" *Supra* ¶ 33.

¶100 To answer that question, I begin where my colleagues began—with EIDPA's statutory language. After all, in interpreting statutes, our goal "is to ascertain the intent of the legislature, the best evidence of which is the plain language of the statute itself." *State v. Miller*, 2023 UT 3, ¶ 65, 527 P.3d 1087 (cleaned up). And I think the relevant language of EIDPA—in both sections 77-23c-104 and -105—is clear.

¶101 First, section 77-23c-104. This section of EIDPA protects, among other things, the privacy of a person's subscriber record, which includes a person's name, address, and telephone number. UTAH CODE § 77-23c-104(1) (2019).[120] And subsection 104(2) speaks in direct terms. It states: "Except as provided in Chapter 22, Subpoena Powers for Aid of Criminal Investigation and Grants of Immunity, a law enforcement agency may not obtain, use, copy, or disclose a subscriber record." *Id.* § 77-23c-104(2) (2019).

¶102 Thus, as relevant here, a law enforcement agency may obtain a subscriber record as part of a criminal investigation, but law enforcement must comply with the Subpoena Powers Statute, which requires that the agency make the necessary showing—that

---

[120] Section 104 was amended in 2021 and 2023. *See infra* ¶ 114 n.123. I refer to the 2019 version of the statute, which was in effect at the relevant time, unless otherwise noted.

is, a reasonable suspicion—to obtain a court-issued subpoena compelling the record's production.[121] *See id.* § 77-22-2.5(2) (2019).

¶103 Subsection 104(3) is equally direct. It establishes the procedure for obtaining a third-party electronic record other than a subscriber record. *See id.* § 77-23c-104(3) (2019). But it imposes a higher burden on law enforcement to obtain this type of record, stating that "[a] law enforcement agency may not obtain" the record "without a warrant." *Id.* And to obtain a warrant, law enforcement must show probable cause. *State v. Evans*, 2021 UT 63, ¶ 26, 500 P.3d 811.

¶104 But these paths are not the only ways law enforcement may obtain subscriber or other electronic records. Section 104 of EIDPA also contains exceptions to its general rules. In 2019, subsection 104(4) stated that "[n]otwithstanding Subsections (2) and (3), a law enforcement agency may obtain . . . a subscriber record, or other record or information related to a subscriber or customer, without a warrant" in specific, enumerated circumstances. UTAH CODE § 77-23c-104(4) (2019). For example, law enforcement could obtain the records with the informed consent of the subscriber or if the electronic communication service provider voluntarily disclosed the record under certain conditions. *Id.* § 77-23c-104(4)(a), (d) (2019).[122]

---

[121] The Subpoena Powers Statute "grant[s] subpoena powers in aid of criminal investigations." UTAH CODE § 77-22-1. It empowers a law enforcement agency investigating a sexual offense against a minor to, with prosecutorial authorization, seek a court order to require an electronic provider to produce certain subscriber information. *Id.* § 77-22-2.5(2)(b)–(c) (2019). To secure the court order, law enforcement must have a "reasonable suspicion that an electronic communications system or service . . . has been used in the commission of a criminal offense," and it is required to "articulate specific facts showing reasonable grounds to believe that the records . . . sought . . . are relevant and material to an ongoing investigation." *Id.* § 77-22-2.5(2) (2019).

[122] At the relevant time, section 77-23c-104(4) stated, in its entirety,

> Notwithstanding Subsections (2) and (3), a law enforcement agency may obtain, use, copy, or disclose a subscriber record, or other record or

(continued . . .)

POHLMAN, J. concurring in part and dissenting in part

¶105 Thus, taken together, subsections 104(2) through (4) dictate how law enforcement agencies may obtain subscriber and other electronic records as part of their criminal investigations. Depending on the type of records sought, subsections (2) and (3) require a subpoena issued by court order or a warrant. And, as shown, subsection (4) delineates specific exceptions to those mandates. If law enforcement obtains the records without complying with subsections (2) and (3), or without falling within the exceptions in subsection (4), law enforcement violates EIDPA.

¶106 Applying the plain language of these statutory provisions to the facts of this case, I conclude that in obtaining Andrus's subscriber records, the State did not comply with the requirements of subsections 104(2) or (4). Carlson did not obtain a court-issued

---

information related to a subscriber or customer, without a warrant:

(a) with the informed, affirmed consent of the subscriber or customer;

(b) in accordance with a judicially recognized exception to warrant requirements;

(c) if the subscriber or customer voluntarily discloses the record in a manner that is publicly accessible; or

(d) if the provider of an electronic communication service or remote computing service voluntarily discloses the record:

(i) under a belief that an emergency exists involving the imminent risk to an individual of:

(A) death;

(B) serious physical injury;

(C) sexual abuse;

(D) live-streamed sexual exploitation;

(E) kidnapping; or

(F) human trafficking;

(ii) that is inadvertently discovered by the provider, if the record appears to pertain to the commission of:

(A) a felony; or

(B) a misdemeanor involving physical violence, sexual abuse, or dishonesty; or

(iii) subject to Subsection 77-23c-104(4)(d)(ii), as otherwise permitted under 18 U.S.C. Sec. 2702.

UTAH CODE § 77-23c-104(4) (2019).

POHLMAN, J. concurring in part and dissenting in part

subpoena as required by subsection 104(2). And no one contends that an exception to those requirements, as set forth in subsection 104(4), applies. Thus, in obtaining Andrus's subscriber records, the State violated the act.

¶107 Having concluded that the State violated EIDPA, I must next resolve whether Andrus has a remedy for that violation. Section 77-23c-105 contains the answer. It states:

> All electronic information or data and records of a provider of an electronic communications service or remote computing service pertaining to a subscriber or customer that are obtained in violation of the provisions of this chapter shall be subject to the rules governing exclusion as if the records were obtained in violation of the Fourth Amendment to the United States Constitution and Utah Constitution, Article I, Section 14.

*Id.* § 77-23c-105 (2019). In other words, if a subscriber record is obtained in violation of EIDPA, it is subject to exclusion.

¶108 Here, because Carlson obtained Andrus's subscriber records without a court-issued subpoena and without falling within one of subsection 104(4)'s exceptions, *see supra* ¶ 106, I have no trouble concluding that the records are subject to the exclusionary rule the legislature built into EIDPA. Andrus's subscriber records are "records of a provider of an electronic communications service . . . pertaining to a subscriber," and Carlson "obtained [them] in violation of" section 77-23c-104. *See* UTAH CODE § 77-23c-105 (2019). Thus, I would conclude that the trial court erred in denying Andrus's motion to suppress.

¶109 The majority, of course, reaches a different conclusion, reasoning that EIDPA's exclusionary rule does not apply. The majority relies on what it views as two ambiguities in EIDPA to arrive at that result. But I believe any potential ambiguity is resolved by considering EIDPA as a whole. *See Thompson v. State*, 2024 UT 27, ¶ 31, 554 P.3d 988 (explaining that we "determine the meaning of the text given the relevant context of the statute (including, particularly, the structure and language of the statutory scheme)" (cleaned up)).

¶110 First, the majority reads section 104 as suggesting law enforcement may obtain subscriber records through means not identified in the statute. *See supra* ¶¶ 45–48. Specifically, the

majority concludes that subsection 104 is "ambiguous about whether its procedure is exclusive," *supra* ¶ 48, because, in identifying the exceptions that apply to its general rules, subsection 104(4) states that "[n]otwithstanding Subsections (2) and (3), a law enforcement agency may obtain" these records "without a warrant" under the enumerated circumstances, UTAH CODE § 77-23c-104(4) (2019).

¶111 The provision's reference to a warrant in its introductory language leads the majority to conclude that the statute suggests "state officers may also obtain subscriber records *with* a warrant—a path not contemplated anywhere in EIDPA or the Subpoena Powers Statute." *Supra* ¶ 45. And that conclusion provides the foundation for the majority's conclusion that the remedy laid out in EIDPA's exclusionary rule was not intended to apply to subscriber records that state law enforcement obtains from federal law enforcement. *See supra* ¶¶ 45–51.

¶112 To begin, I readily acknowledge that there is some latent ambiguity in the 2019 version of subsection 104(4) and its reference in the introductory language to a warrant. Because subsection 104(4) purports to identify exceptions to the requirements of subsections 104(2) *and* 104(3), it presumably should have referred to both subpoenas (as referenced in subsection 104(2)) *and* warrants (as referenced in subsection 104(3)). But, considering this provision in context, I don't read the inclusion of the word "warrant" in the introductory language of subsection 104(4) as implicitly opening the door to additional, unenumerated exceptions to the requirements of subsection 104(2). *See Thompson,* 2024 UT 27, ¶ 31; *Oliver v. Utah Lab. Comm'n,* 2017 UT 39, ¶ 20, 424 P.3d 22 ("[T]he fact that the statutory language may be susceptible of multiple meanings does not render it ambiguous; all but one of the meanings is ordinarily eliminated by context." (cleaned up)).

¶113 As shown, the statutory scheme is clear: In subsection 104(2), the legislature instructed that law enforcement may not obtain a subscriber record without a court-issued subpoena; in subsection 104(3), the legislature instructed that law enforcement may not obtain records other than subscriber records without a warrant; and in subsection 104(4), the legislature identified several exceptions to those two requirements. With the legislature having articulated requirements and specific, enumerated exceptions to those requirements, I cannot conclude its use of the word "warrant" in the introductory language of subsection 104(4) is a

signal that the legislature intended to allow additional unspoken exceptions to subsection 104(2).

¶114 Instead, I understand subsection 104(4)'s reference to a "warrant" to be referring to the warrant requirement for obtaining records other than subscriber records as set forth in subsection 104(3). While perhaps it would have been more complete for the legislature to also have referred to subpoenas in the introductory language of subsection 104(4), I don't believe its absence undermines the provisions' express mandates.[123] The legislature spoke plainly when it dictated that law enforcement may not obtain a subscriber record without a court-issued subpoena. And it spoke plainly when it identified specific exceptions to that requirement. I simply cannot read the statutory scheme as a whole and conclude that the use of the word "warrant" in the introductory language of 104(4) reflects a legislative intent to allow law enforcement to obtain a subscriber record through other methods not identified in subsections 104(2) or (4).

¶115 But even interpreting the inclusion of "warrant" in subsection 104(4) as reflecting legislative intent to introduce an additional exception beyond those specifically identified, I still would read that introductory language as allowing law enforcement to obtain a subscriber record *by warrant*.[124] That is, however, as far as I think that language can go. I see no support in the statutory text for the conclusion that the legislature intended to allow law enforcement to obtain a subscriber record by means not mentioned in EIDPA, and particularly by means that lend less privacy protection than the means laid out in subsection 104(2).

---

[123] In fact, the legislature subsequently amended subsection 104(4) to include both references. The introductory provision now reads, "Notwithstanding Subsections (2) and (3), a law enforcement agency may obtain, use, copy, or disclose a subscriber record, or other record or information related to a subscriber or customer, without *an investigative subpoena* or a warrant." UTAH CODE § 77-23c-104(4) (2025) (emphasis added).

[124] I see no problem with such a reading because a greater showing is required to obtain a warrant than to obtain a subpoena under the Subpoena Powers Act. *See supra* ¶¶ 102–03. Thus, recognizing such an exception would not undermine the protections the legislature provides under subsection 104(2).

POHLMAN, J. concurring in part and dissenting in part

¶116 Next, I also depart from the majority's interpretation of the exclusionary rule in section 77-23c-105. *See supra* ¶¶ 41–43. Once again, the majority sees ambiguity where I do not.

¶117 The majority suggests that EIDPA is ambiguous as to whether its exclusionary rule applies to *all* subscriber records obtained by law enforcement in violation of EIDPA or to only those subscriber records obtained directly from service providers. *See supra* ¶¶ 40–43. Pointing to the exclusionary rule's application to "electronic records '*of* a [service provider] . . . that are obtained in violation of' EIDPA," *supra* ¶ 41 (emphasis added), the majority opines that the word "of" could be interpreted to indicate a possessive relationship, such that the exclusionary rule only applies "when state officers gain access to subscriber records *possessed by* service providers," *supra* ¶ 42.

¶118 But I am wary of resorting to relying on the meaning of "of" to find ambiguity in the statute. That is because "of" is a broad preposition with many meanings, the construction of which is heavily dependent on context.[125] And although you could construe "of" to mean "possessed by," I don't think that construction is supported by the overall statutory scheme. *See Thompson*, 2024 UT 27, ¶ 31.

¶119 Namely, if we construe "of" in section 105 as meaning "possessed by," I think we must construe "of" as used in a similar clause in subsection 104(1) in the same way. *See State v. Harker*, 2010 UT 56, ¶ 12, 240 P.3d 780 ("[W]e read the plain language of a statute as a whole and interpret its provisions in harmony with other statutes in the same chapter and related chapters." (cleaned up)). The provisions are obviously related. Section 105 provides the remedy for the violation section 104 describes. UTAH CODE § 77-23c-105 (2019) (providing for exclusion of records "obtained in violation of the provisions of this chapter"). And the language in the exclusionary rule closely mirrors the language in section 104. As relevant here, the records subject to the exclusionary rule in section 105 are the "records *of a provider of an electronic communications service* . . . pertaining to a subscriber." *Id.* (emphasis added). Similarly, in section 104, a "subscriber record" is defined

---

[125] The dictionary cited by the majority identifies nearly two dozen possibilities. *See Of*, MERRIAM-WEBSTER, https://www.merriam-webster.com/dictionary/of (last visited May 5, 2025); *see supra* ¶ 42 & n.46.

as "a record . . . *of a provider of an electronic communication service* . . . that reveals the subscriber's . . . name; . . . telephone number"; and other related information.[126] *Id.* § 77-23c-104(1) (2019) (emphasis added).

¶120 So, if we construe "of" to mean "possessed by" in subsection 104(1), that means a "subscriber record" is defined for purposes of that section as "a record or information [*possessed by*] a provider of an electronic communication service . . . that reveals the subscriber's" identifying information. *Id.* In other words, under the majority's interpretation, a person's records revealing the person's name, telephone number, and other related information is only a "subscriber record" if the record is in the electronic communication service's possession. But if we try to insert that definition into other parts of section 104, it doesn't comfortably fit.

¶121 For example, subsection 104(2) states that "a law enforcement agency may not . . . disclose a subscriber record." *Id.* § 77-23c-104(2) (2019). But it's difficult to imagine how law enforcement would disclose a record if that record is in another's possession. Thus, it's unclear what work "disclose" is doing in this context if we define "subscriber record" as only those records in the possession of the electronic communication service. Another example is in subsection 104(4)(c). It allows law enforcement to obtain a subscriber record without complying with subsection 104(2) "if the subscriber . . . voluntarily discloses the record in a manner that is publicly accessible." *Id.* § 77-23c-104(4)(c) (2019). But

---

[126] The majority interprets my argument as suggesting that it is necessary to construe "the word 'of' consistently throughout the statute." *Supra* ¶ 43. The majority misunderstands my argument. Doubtless, "'of' is a common word with myriad definitions used in myriad contexts," *supra* ¶ 43, and its meaning will likely vary across a statute. But here, where two nearly identical phrases appear in related provisions of EIDPA, I argue that the phrases should be construed in the same way. *Compare* UTAH CODE § 77-23c-105 (2019) ("records of a provider of an electronic communications service . . . pertaining to a subscriber"), *with id.* § 77-23c-104(1) (2019) ("a record . . . of a provider of an electronic communication service . . . that reveals the subscriber's" information). And, in context, I do not believe that "of" as used in these specific provisions carries the meaning that the majority assigns.

if we define "subscriber record" as meaning only those records in the possession of the electronic communication service, subsection 104(4)(c) loses meaning. If the record has been voluntarily disclosed by the subscriber in a publicly accessible way, the record is no longer a subscriber record within the meaning of the section and would fall outside of the section's prohibitions.

¶122 Given these incongruities, I cannot agree with the majority that a "subscriber record" refers only to a record that is possessed by an electronic communication service provider. *See State v. Rushton*, 2017 UT 21, ¶ 11, 395 P.3d 92 ("[W]e read the plain language of the statute as a whole . . . avoiding any interpretation which renders parts or words in a statute inoperative or superfluous in order to give effect to every word in the statute." (cleaned up)). Instead, I conclude that the phrase "records of a provider of an electronic communications service" as used in sections 104 and 105 means an electronic communication service provider's records. Most often, law enforcement presumably will obtain these records directly from the service provider. But if law enforcement obtains them from another source, like the federal government, those records don't become "records of the federal officers." *See supra* ¶ 42. Rather, the records are still records of the electronic communication service and law enforcement still must comply with the terms of subsection 104(2) unless an exception in subsection 104(4) applies.

¶123 In addition to believing that this result is compelled by the plain language chosen by the legislature, I also believe it's compelled by statutory design. With several exceptions, the legislature has prohibited law enforcement from obtaining subscriber records without seeking a court-issued subpoena. Had the legislature intended to excuse law enforcement from compliance if the documents were received from other government agencies, I don't believe it would have hidden that intent in the use of the word "of." Instead, I believe we would have seen that exception included with the other exceptions identified in subsection 104(4).[127]

---

[127] The majority relies on the "interpretive principle that the legislature does not normally hide elephants in mouseholes." *See supra* ¶ 46 (cleaned up). Fair enough. But I think the exception its analysis effectively adopts does just that. I simply cannot agree that

(continued . . .)

¶124 Finally, the majority turns to legislative history to resolve the ambiguities it sees in EIDPA. Because I believe the statutory context resolves any potential ambiguity in sections 104 and 105, I find the legislative history to be unnecessary. *See Belnap v. Howard*, 2019 UT 9, ¶ 13, 437 P.3d 355 ("[W]hen the language of a rule or statute is clear, we do not look to other sources, such as legislative history, for interpretive guidance. Instead, only when we find ambiguity do we turn to additional tools to help us understand the rule." (cleaned up)). But even if the legislative history were relevant, I don't believe it expressly answers the question posed by this case. During the committee hearings, there was no discussion about how state and federal agencies work together and how this statute might affect their sharing of information. As a result, it's difficult to draw any meaning from the history about the statutory ambiguities the majority identifies.

¶125 But to the extent the history provides any illuminating content, I believe it supports my interpretation of the statute's plain language. For example, in describing the bill's reach, a supporter speaking at the sponsor's request affirmed what the statute's language already reflects—that "all of the exceptions" to the statute's requirements are found in subsection 104(4), including an exception that matches a federal law allowing for voluntary production of records under certain circumstances. House Jud. Comm., H.B. 57, 2019 Leg., Gen. Sess. (Feb. 12, 2019), https://le.utah.gov/av/committeeArchive.jsp?timelineID=13179

---

the legislature would have articulated its prohibition and its exceptions as directly as it has only to hide another exception in the exclusionary rule.

Further, the "elephants in mouseholes" principle that the majority invokes works well when applied to the abolition of well-established common law principles. *See Burton v. Chen*, 2023 UT 14, ¶ 40 & n.5, 532 P.3d 1005; *Rutherford v. Talisker Canyons Fin., Co.*, 2019 UT 27, ¶ 53, 445 P.3d 474. In such instances, we've said that we will "usually presume that if the Legislature intended a major change to common law, it will either tell us or give us other textual clues about its intent." *Burton*, 2023 UT 14, ¶ 40 n.5. But we're not talking about changes to common law here, and, as explained, I think the legislature has given us clear textual clues about its intent. Any "speculation as to a contrary legislative purpose cannot quash our construction of the plain language." *Olsen v. Eagle Mountain City*, 2011 UT 10, ¶ 23 & n.6, 248 P.3d 465.

4; *see also* UTAH CODE § 77-23c-104(4)(d)(iii) (2019) (citing 18 U.S.C. § 2702). This history suggests that the legislature intended to capture the exceptions to its general rules in subsection 104(4), including any exceptions that would have allowed law enforcement to obtain subscriber records under federal law.

¶126 In sum, I conclude that Carlson violated EIDPA when he obtained Andrus's subscriber records without complying with subsections 77-23c-104(2) or 104(4). I also conclude that that violation triggered the exclusionary rule in section 77-23c-105 and that the trial court erred in denying Andrus's motion to suppress. Although I appreciate my colleagues' concern about the possibility that my interpretation of the statute might have some effect on the cooperation of different law enforcement agencies, *see supra* ¶ 46–47, I believe the plain language of the statute compels a different result from theirs. "Where the statute's language marks its reach in clear and unambiguous terms, it is our role to enforce a legislative purpose that matches those terms, not to supplant it with a narrower or broader one . . . ." *Hooban v. Unicity Int'l, Inc.*, 2012 UT 40, ¶ 17, 285 P.3d 766. For these reasons, I dissent.

––––––––––